IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ERIN GRAHAM,

                              Petitioner,

        v.                                              OPINION and ORDER

UNITED STATES OF AMERICA,                               24-cv-253-jdp

                              Respondent.

A jury convicted Erin Graham of trafficking four women for sex by using force, threats, fraud, or coercion. Graham challenges his conviction under 28 U.S.C. § 2255, contending that his lawyer in this court was constitutionally ineffective. Specifically, Graham contends that counsel was ineffective in the following ways: giving him bad advice that caused him to reject a plea deal, including by failing to discuss the importance of the government's fraud theory and failing to adequately explain the potential sentence he could receive; failing to interview witnesses, including one of the victims who asked to speak with Graham's counsel; failing to withdraw from the case when he learned that he may need to testify as a witness; and failing to seek one of the victims' mental health records.

For the reasons below, the court concludes that a hearing is needed to resolve Graham's claims related to the government's plea offer. All other claims will be dismissed because it is clear from the materials Graham submitted that he cannot prevail on those claims.

BACKGROUND

In March 2018, a grand jury indicted Graham on two counts: (1) sex trafficking "known victim 1" (KV1) by force, threats of force, or coercion; and (2) transporting KV1 and "known

victim 2" (KV2) across state lines to engage in prostitution. Dkt. 5.[1] Reed Cornia, who was representing Graham in related state-court proceedings, was appointed to represent Graham in this court. Dkt. 3. In May 2018, a grand jury returned a superseding indictment with an additional count that Graham conspired with Patience Moore to commit sex trafficking of KV1 by force, threats of force, or coercion. Dkt. 16.

In December 2018, Graham filed a pro se letter in which he accused Cornia of "neglecting" him, alleging that Cornia had missed appointments with him and was not interviewing witnesses, among other things. Dkt. 71. Graham did not ask for specific relief but instead asked more generally for "some remedy to his situation." *Id.* at 2. During a hearing with Magistrate Judge Crocker, "defendant Graham and Attorney Cornia advised the court that they can continue to work together and are continuing to work together productively in preparing for trial on January 28, 2019." Dkt. 74. Judge Crocker concluded that the issues raised in Graham's pro se letter were moot. *Id.*

Later in December 2018, Moore sought a subpoena for KV1's mental health records, and she asked the court to conduct an in camera review to determine which records should be disclosed. Dkt. 76. Graham did not join the motion. During a hearing on the motion, counsel for the government stated that KV1 "really is scared of these people." Dkt. 85, at 7.

A few days after the hearing, Cornia moved to withdraw. He wrote that he interpreted the government's statements during the hearing to mean that KVI "feared Mr. Graham and Ms. Moore and did not want anything to do with them." Dkt. 90, at 1. This led Cornia to

---

[1] Citations to docket entries are to the criminal case, No. 18-cr-43-jdp, unless otherwise noted. Citations to documents filed on the docket reflect the page numbers as they appear on the headers in the court's electronic case file, not the page numbers on the documents themselves.

believe that he was a potential witness because he had a conversation with KV1 in March 2018 in which she was "offering assistance to Mr. Graham and stating something to the effect that Mr. Graham did not belong in jail or did not deserve the charges he faced (sex trafficking)." Cornia also wrote that he "scheduled a face-to-face meeting with [KV1] so [he] could have a staff person present during her statement to [Cornia]," but she "never showed up for the meeting." *Id.* So Cornia moved "for an Order allowing him to withdraw from Mr. Graham's case or in the alternative a ruling on the admissibility of potentially impeachable statements made to Counsel by" KV1. *Id.* Cornia represented that Graham did not want him to withdraw. *Id.* at 2. I denied the motion because Cornia's withdrawal would work a substantial hardship on Graham by delaying trial. Dkt. 92, at 1. I also noted that it was uncertain whether Cornia would need to testify. *Id.*

Moore moved for reconsideration, asking the court to schedule a hearing on the withdrawal issue. Dkt. 96. Moore argued that KV1's credibility would be a key issue during trial, and "Mr. Cornia's testimony offers perhaps the most powerful impeachment evidence of the case's key witness," so a hearing was needed to consider both defendants' interests. *Id.*

I asked for additional input from the parties. Dkt. 117. In response, the government summarized statements it had obtained from Cornia and KV1. Dkt. 120-1. Cornia said that he spoke to KV1 over the phone for approximately 30 seconds, and she "said she was calling to help, or that [Graham] doesn't deserve this, or maybe she said both things. It was 'something along those lines.'" *Id.* at 1. The government summarized KV1's statement about her conversation with Cornia as follows:

> KV1 said she was worried about being involved in the case and worried about her child being taken from her. She said she wanted the matter over with and that she was not going to testify against [Graham]. She asked how she could make this go away.

> [Graham]'s attorney told her the only way to do that is for her to
> say she was lying. KV1 asked if she would get in trouble with her
> attorneys. [Graham]'s attorney said he could not talk about that
> on the phone but that she would not be on their good side.
> [Graham]'s attorney said he would produce a sheet of paper that
> she could sign to make it go away. KV1 said that she would sign
> it. [Graham]'s attorney later sent her a text with the time and date
> for her to show up to sign the paper.

*Id.* at 1–2. KV1 also said that she did not show up for the meeting, but she called Cornia again;

he answered "but said he had to go because he had another client on the line and hung up."

*Id.* at 2. She tried to call him "8–10" more times, but he did not pick up, and she did not leave

a message. *Id.*

In response to these statements, Moore asked that the court appoint a second attorney

to represent Graham "so that Attorney Cornia can be called as a witness and properly examined

by all parties during trial." Dkt. 118. I granted that request. Dkt. 119.

In January 2019, Graham and Moore moved to continue the trial date from January

28, 2019, to April 8, 2019. Dkt. 103. Counsel for defendants cited multiple reasons, including

outstanding discovery issues and workload. Magistrate Judge Crocker granted the motion.

Dkt. 104.

Later in January 2019, a grand jury returned a second superseding indictment. The new

indictment made two changes that are relevant to Graham's motion: (1) it added fraud as one

of the means that Graham trafficked KV1; and (2) it added new trafficking counts for three

more victims—KV2, KV3, and KV4—and those counts also included fraud as one of the means.

Dkt. 123.

In February 2019, the government filed a brief opposing Moore's request for KV1's

mental health records, contending that Moore had failed to meet the standard under Federal

Rule of Criminal Procedure 17(c) for obtaining a subpoena and that the records were privileged. Dkt. 130.

In March 2019, the government offered a plea agreement in which Graham would plead guilty to sex trafficking KV1, and the remaining charges would be dismissed. No. 24-cv-253-jdp, Dkt. 283-4. The sex trafficking charge at issue, 18 U.S.C. § 1591(a)(1) and (b)(1) carries a mandatory minimum of 15 years in prison. *Id.* Graham rejected the offer.

On March 14, 2019, Moore pleaded guilty. Dkt. 155. The following day, Magistrate Judge Crocker denied as moot Moore's request for an in camera review of KV1's mental health records. Dkt. 157.

On March 22, 2019, Graham filed a pro se letter in which he asked for an ex parte hearing because of problems with Cornia's representation. Dkt. 163. Among other things, Graham alleged that he "did not know [he] had so many new charges until we were in court on Friday" and that "there are witnesses [Graham] ask[ed] [Cornia] to contact that he has not mention[ed]." *Id.* at 1. Graham wanted to keep the trial date if Cornia could "give [the court and Graham] his word that he can make these things happen" before trial, but "if he can't focus on [Graham's] trial," Graham asked for "consideration of a new attorney." *Id.* at 2. A few days later, Graham filed another pro se letter, stating that he no longer wanted a hearing, he did not want the trial pushed back, and he was "sure Mr. Cornia is going to help me defend myself against these charges." Dkt. 173.

On April 1, I appointed Nicholas Gansner to assist Cornia at trial. Dkt. 180.

Trial began on April 8 and lasted five days. Each of the four known victims in the indictment testified against Graham, and Graham testified for himself.

5

The jury found Graham guilty on all counts. Dkt. 201. I later sentenced Graham to 300 months of imprisonment for the sex-trafficking counts and 120 months for the transportation counts, to run concurrently. Dkt. 250.

Graham appealed the conviction, contending that his rights under the Confrontation Clause were violated because the government played a recording that included Moore accusing him of sex trafficking, but Graham did not have an opportunity to cross examine Moore about the accusation. The court of appeals affirmed the conviction, concluding that there was no violation of the Confrontation Clause, and even if there was, the error was harmless because the government's case against Graham was very strong, and Moore's statements were both cumulative and of limited evidentiary value. *U.S. v. Graham*, 47 F.4th 561, 563 (7th Cir. 2022).

## ANALYSIS

### A.  Overview of claims and legal standards

Graham contends that Cornia was constitutionally ineffective for the following reasons:

1.  He did not explain to Graham that fraud was a significant theory in the sex-trafficking charges.

2.  He did not interview KV1 or the other victims to determine what their testimony was likely to be.

3.  He did not explain how the sentencing guidelines would apply to any of the charges except for Count 2 involving the sex trafficking on KV1.

4.  He did not inform Graham about a plea offer from the government before the offer expired.

5.  He did not withdraw from the case when he should have known that he was a potential witness.

6

6. He did not seek to obtain KV1's mental health records.[2]

A claim for ineffective assistance of counsel has two elements: (1) deficient performance; and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984). To prove deficient performance, Graham must show Cornia's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688. The court must "indulge a strong presumption that [Cornia's] conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689. To prove prejudice, Graham must show "a reasonable probability that, but for [Cornia's] unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The question before the court now is not whether the petition should be granted. Rather, the question is whether Graham is entitled to a hearing. The court must hold a hearing unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The court of appeals has construed this to mean that a hearing is necessary "when the petitioner alleges facts that, if proven, would entitle him to relief." *Boulb v. U.S.*, 818 F.3d 334, 339 (7th Cir. 2016) (internal quotation marks omitted). In applying that standard, the court may disregard "allegations that are vague, conclusory, or palpably incredible, rather than detailed and specific." *Id.*

The first four alleged deficiencies are related to Graham's allegation that he would have accepted the government's plea offer but for Cornia's deficient performance, so the court will consider those issues first.

---

[2] Graham also includes various other criticisms of Cornia's performance in his statement of facts. But his briefs do not include an argument that the other issues qualify as ineffective assistance of counsel, and Graham does not explain how any of those issues prejudiced him, so the court will not consider the issues.

**B. Failure to provide adequate plea advice**

A defendant has the right to effective assistance of counsel in deciding whether to accept a plea offer. *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). The *Strickland* standard applies at this stage, *Sawyer v. United States*, 874 F.3d 276, 278 (7th Cir. 2017), but courts have provided additional guidance for what prejudice means in that context. Specifically, the defendant must show a reasonable probability that, but for his counsel's deficient performance, the following things would have happened: (1) the defendant would have accepted the plea; (2) the government would not have withdrawn the plea offer in light of intervening circumstances; (3) the court would have accepted the plea's terms; and (4) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. *Brock-Miller v. U.S.*, 887 F.3d 298, 311–12 (7th Cir. 2018).

In this case, the parties assume at this stage that requirements (2) through (4) of the prejudice inquiry are satisfied, so the court will not address those. As for the first requirement, Graham must do more than simply allege that he would have pleaded guilty; he must also come forward with objective evidence supporting that allegation. *Hutchings v. U.S.*, 618 F.3d 693, 697 (7th Cir. 2010). Objective evidence includes the nature of the misinformation provided by the attorney to the petitioner and the history of plea negotiations. *Id.*

The question is a close one, but the court concludes that Graham has provided enough evidence to warrant a hearing on the question whether he was denied effective assistance of counsel when deciding whether to accept the government's plea offer.

On the question of deficient performance, a threshold challenge for Graham is that he concedes that Cornia gave him the correct advice when he was presented with the government's plea offer: take the offer. Graham contends that Cornia was ineffective for four other reasons:

1. After the government added a fraud theory to the sex-trafficking charges, Cornia did not explain to Graham the importance of that theory or how that theory would make it harder to prevail at trial.[3]

2. Cornia did not interview KV1 or the other victims or take other steps to determine what their testimony was likely to be, even after KV1 reached out to Cornia, so Graham still believed when he rejected the government's plea offer that the victims would not testify against him.

3. Cornia did not explain to Graham how the sentencing guidelines would apply to any of the charges except for Count 2 involving the sex trafficking of KV1.

4. The government's plea offer expired on March 19, 2019, but Cornia did not inform Graham about the offer until March 21.

Almost all the cases involving ineffective assistance at the plea stage that Graham relies on in his briefs involved claims that counsel gave the defendant the wrong advice on *how* to plead (and the petitioner followed that advice) or simply failed to provide any advice.[4] The only exception is *Foster v. United States*, in which the petitioner acknowledged that his lawyer gave him the correct advice to plead guilty but contended that his lawyer was ineffective for

---

[3] Graham's declaration includes a confusing sentence that Cornia "did not explain how fraud was not a significant theory in the case for all known victims." Dkt. 283-1, ¶ 11. Based on the argument in Graham's brief, the court understands that the second "not" is a typographical error, and the sentence should read that Cornia "did not explain how fraud was a significant theory in the case for all known victims."

[4] *See U.S. v. Reed*, 719 F.3d 369, 371 (5th Cir. 2013) (challenging recommendation to reject plea offer); *Williams v. Jones*, 571 F.3d 1086, 1088 (10th Cir. 2009) (same); *Julian v. Bartley*, 495 F.3d 487, 499 (7th Cir. 2007) (same); *Boria v. Keane*, 99 F.3d 492, 494 (2d Cir. 1996) (challenging failure to provide any advice); *U.S. v. Day*, 969 F.2d 39, 40 (3d Cir. 1992) (challenging recommendation to reject plea offer). The court's own research also uncovered cases in which courts granted relief to petitioners alleging that they followed their lawyer's bad advice on how to plead. *See Torres–Chavez v. United States,* 828 F.3d 582, 583 (7th Cir. 2016) (challenging recommendation to reject plea offer); *DeBartolo v. U.S.*, 790 F.3d 775, 780 (7th Cir. 2015) (challenging recommendation to accept plea offer); *Quintana v. Chandler*, 723 F.3d 849, 855–57 (7th Cir. 2013) (same); *Kerr v. Thurmer*, 639 F.3d 315, 318 (7th Cir. 2011) (challenging recommendation to reject plea offer); *Paters v. U.S.*, 159 F.3d 1043 (7th Cir. 1998) (same); *Toro v. Fairman*, 940 F.2d 1065, 1068 (7th Cir. 1991) (same).

failing to warn him of the possibility that the government would file a Section 851 information that would increase his mandatory minimum by ten years. 735 F.3d 561, 566 (7th Cir. 2013). In that case, the court assumed without deciding that the lawyer's performance was deficient because the court concluded that there was no prejudice. *Id.*

Having said that, neither side has cited any authority holding or implying that counsel cannot be ineffective in the plea context unless counsel gives the "wrong" advice on whether to plead guilty. The question remains whether Cornia's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. When advising a client on a plea, "[a] reasonably competent attorney will attempt to learn all of the facts of the case, make an estimate of the likely sentence, and communicate the result of that analysis." *Julian*, 495 F.3d at 495. The government does not dispute in this case that a reasonably competent lawyer would have followed up on KV1's request to talk, explained the potential trial implications for the government's new fraud theory, explained the potential sentence for all the charges in the indictment, and provided Graham with timely notice of the government's plea offer.

"Ineffective assistance claims generally require an evidentiary hearing if the record contains insufficient facts to explain counsel's actions as tactical." *Osagiede v. U.S.*, 543 F.3d 399, 411–12 (7th Cir. 2008). In this case, a hearing is needed to determine whether Cornia acted as Graham alleges, and if so, whether Cornia had a strategic reason for doing so.

The government's argument appears to focus on the issue of prejudice. As for the failure to interview KV1 and other witnesses, the government says that Graham has not identified any favorable testimony that witnesses would have offered. But that is the point. Graham says that he believed at the time that the victims would testify in his favor. Dkt. 283-1, ¶ 19. That belief had some support at the time based on KV1's efforts to contact Cornia. If Graham had known

10

that all the victims were all testifying against him, he says that he would have pleaded guilty. *Id.*, ¶ 20.[5] The government's case rested largely on the testimony of the four victims, so it is plausible that information about their likely testimony could have been decisive in a pleading decision. In the context of an ineffective assistance claim for bad plea advice, evidence of prejudice includes "the type of mis-information likely to impact a plea." *See Julian*, 495 F.3d at 499.

The government's only response to this is that the victims' testimony was already "locked in" during the grand jury proceedings. No. 24-cv-253-jdp, Dkt. 31, at 13. But the government does not explain how Graham would have known how the victims testified before the grand jury or even whether they testified. In fact, Graham says in his declaration that he did not even know at the time of the plea offer who all the known victims in the superseding indictment were. Dkt. 283-1, ¶ 19.

Graham's evidence of prejudice is not robust, but "[t]he petitioner's burden for receiving an evidentiary hearing is relatively light." *Torres–Chavez*, 828 F.3d at 586. The court concludes that a hearing is needed to determine what Graham knew about the known victims' likely testimony and how that information affected his decision to reject the government's plea deal.

It is a closer call whether Graham has alleged prejudice regarding Cornia's alleged failure to explain the importance of the government's fraud theory and failure to discuss the

---

[5] Graham presents an alternate theory in his brief that KV1 could have made statements that were favorable to Graham if Cornia had interviewed her, and he could have used those statements to impeach her during trial. But Graham did not submit a declaration from KV1 regarding what she would have said, so the only indication we have of that is how she testified at trial. So any theory of prejudice based on the possibility that KV1 would have provided exculpatory evidence is speculative and not supported by objective facts.

sentencing guidelines for all his charges. As for the fraud theory, Graham says in his declaration that he would have accepted the plea offer if he "understood the government's theory about compulsion to be based in fraud." Dkt. 283-1, ¶ 13. But he doesn't explain why. A conclusory statement in a declaration generally is not enough to require a hearing. *Boulb*, 818 F.3d at 339. In his brief, Graham says that fraud was "easily . . . proven," in part because "he kept no receipts, no books, and would be unable to prove how the money was divided." Dkt. 283, at 21, 24. But Graham did not concede fraud at trial. He testified repeatedly that each of the known victims were paid what he promised them, Tr. Trans. Day 4, afternoon, Dkt. 217, at 70:6–7; Tr. Trans. Day 5, Dkt. 211, at 50, and he denied making other promises, Tr. Trans. Day 4, Dkt. 217, at 68:19–22, Tr. Trans. Day 5, Dkt. 211, at 49–50. Neither side presented documentary evidence of what was promised and what was paid, so it came down to the credibility of the witnesses. That is no different from the evidence presented about coercion, threats, and force: the victims testified that Graham used those means to sex traffic them; Graham denied that he did so.

Graham says that the difference was that he believed at the time of the plea offer that he "had witnesses and evidence to rebut th[e] allegations" about force and coercion. Dkt. 283, at 24. But if Graham believed that witnesses would support him regarding the allegations of force and coercion, why didn't he believe the same thing regarding fraud? Graham does not say.

At this point, Graham has not plausibly alleged that a better understanding of the government's fraud theory, by itself, would have led him to accept the government's plea offer. But the court must look at the potential cumulative effect of different instances of deficient performance. *Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020). The court has already

concluded that Graham is entitled to a hearing on the issue of Cornia's alleged failure to investigate witnesses, so if the alleged failure to explain the fraud theory contributed even slightly to Graham's decision to reject the plea offer, the court must consider it. The addition of the fraud theory did provide a substantial new avenue for the government to obtain a conviction, so it could have had some influence on Graham's decision whether to plead guilty. The court will allow Graham to present evidence at the hearing that Cornia's failure to explain the government's fraud theory contributed to his decision to reject the government's plea offer.

As for Cornia's alleged failure to discuss how the sentencing guidelines would apply to all of the charges in the superseding indictment, it is well established that faulty or incomplete advice regarding a potential sentence can qualify as ineffective assistance. *See Brock-Miller*, 887 F.3d at 310; *U.S. v. Barnes*, 83 F.3d 934, 939–40 (7th Cir. 1996). But Graham says nothing in his declaration about how or whether his decision to reject the plea offer was influenced by information that Cornia did or did not provide about sentencing implications. So Graham has not plausibly alleged that he was prejudiced by any failure by Cornia to adequately explain the sentencing guidelines. Again, however, the court will hold a hearing on the issue whether Graham rejected the government's plea offer because of Cornia's failure to investigate witnesses. As with the failure to explain the implications of the fraud theory, a failure to explain the sentencing guidelines could have contributed to Graham's decision, so the court will allow Graham to develop that issue at the hearing.

As for Cornia's alleged failure to communicate the plea deal, the government does not dispute that a hearing is needed to determine when Cornia told Graham about the plea offer and whether any delay prevented Graham from accepting the offer. However, even if Cornia waited until after the offer expired to communicate the offer to Graham, there could be no

prejudice unless Graham first shows that he would have accepted the offer but for Cornia's alleged ineffectiveness. So this aspect of Graham's claim will be contingent on Graham showing that he rejected the plea offer because Cornia gave him bad or incomplete advice.

## C. Failure to withdraw from the case

Graham contends that Cornia was ineffective "for failing to timely withdraw when he became a material witness to KV1's recantation." Dkt. 283, at 25. This contention is based on the short conversation that Cornia had with KV1 in March 2018 during which, according to Cornia, KV1 said "something to the effect that Mr. Graham did not belong in jail or did not deserve the charges he faced (sex trafficking)." Dkt. 90, at 1.[6] Graham says that Cornia should have realized that he would need to testify about the statements KV1 made to him, so Cornia should have withdrawn "promptly" so that he could serve as a witness. Dkt. 283, at 25. Graham alleges that Cornia chose not to testify so that he could protect himself rather than serve his client.

Graham acknowledges that Cornia *did* move to withdraw in December 2018 on these grounds. The court denied that motion, in part because it would have delayed trial, while also noting that Graham did not want Cornia to withdraw. Dkt. 92. But the court granted Moore's request to appoint a second attorney, Nicholas Gansner, "so that Attorney Cornia can be called as a witness and properly examined by all parties during trial." Dkt. 118 and Dkt. 119.

---

[6] The quoted statement is from a motion that Cornia filed with the court in the criminal case. The government later took a statement from Cornia regarding his conversation with KV1, and, according to the government's summary, Cornia remembered KV1 saying that "she was calling to help, or that [Graham] doesn't deserve this, or maybe she said both things. It was 'something along those lines.'" Dkt. 120-1, at 1.

Graham has not shown that he is entitled to a hearing on this claim. A threshold problem is that Graham does not identify when he believes that Cornia should have withdrawn from the case. He seems to imply in his brief that Cornia should have moved to withdraw as soon as he had the conversation with KV1 in March 2018. But Graham does not support that view. As already discussed, it was not clear at the time that KV1 contacted Cornia how she was likely to testify at trial, so Cornia did not yet know that KV1's statements were potential grounds for impeachment. Graham is suggesting a rule that would require defense counsel to withdraw immediately after an alleged victim makes a statement that could be favorable to the defense. Graham cites no authority in support of such an unreasonable rule.

Graham does not point to any evidence suggesting that Cornia knew before December 2019 of a potential conflict between the statements KV1 made to him and her likely testimony at trial. Distilled, Graham's argument seems to be that Cornia *should have* known about a potential conflict before then because he should have followed up on KV1's attempt to talk to Cornia. But that is just a repackaging of Graham's claim that Cornia was ineffective for failing to investigate the likely testimony of trial witnesses, and the court has already determined that Graham is entitled to a hearing on that claim.

Regardless of how this claim is properly characterized, Graham has not alleged any facts showing prejudice. Graham's primary argument regarding prejudice is that failing to withdraw prevented defense counsel from impeaching KV1 at trial with the statements she made to Cornia.[7] But this argument fails for multiple reasons. First, Cornia's failure to withdraw did

---

[7] Graham also says that a "prompt, timely withdrawal would have prevented many of the other aspects of deficient performance and prejudice discussed elsewhere in this motion." Dkt. 283, at 25. But Graham does not explain what he means by this, and he identifies no prejudice other than the failure to impeach KV1 with her prior statements, so this argument is forfeited.

not prevent Graham from introducing evidence of KV1's alleged statements to Cornia. As noted above, the court granted Moore's request to appoint Gansner for that purpose. Graham does not contend that any ethical obligation would have prevented Cornia from remaining on the case while providing brief testimony elicited by another lawyer. Instead, Graham cites a declaration that Gansner submitted, averring that he did not understand his role to include conducting an examination of Cornia. Dkt. 283-3. As the government points out, the issue of the potential need for Cornia to testify was discussed during the final hearing, Dkt. 267, at 20 and during trial, Dkt. 208, at 25, when Gansner was present, *see* Dkt. 185 and Dkt. 191. But even if the court assumes that Gansner's misunderstanding was somehow Cornia's fault, that still would not be the direct result of Cornia's failure to withdraw.

Graham's claim that Cornia should have withdrawn is really a claim that Cornia should have directed Gansner to put him on the witness stand to attempt to impeach KV1. But Graham cannot show deficient performance or prejudice for such a claim. As Cornia himself acknowledged in his motion to withdraw, his memory was hazy regarding exactly what KV1 said to him. Cornia believed that KV1 said "something to the effect" that Graham "did not belong in jail" or "did not deserve the charges he faced." Dkt. 90, at 1. The government had already indicated during the final pretrial conference before Magistrate Judge Crocker that they would challenge Cornia's testimony as "very unsure and wishy-washy." Dkt. 266, at 40.

But even if the court assumes that Cornia could have persuaded the jury that KV1 made statements like the ones he identified in his motion to withdraw, there is no reasonable possibility that Cornia's testimony could have led to a different result at trial, and, in fact, any attempt to impeach KV1 could have easily backfired. Statements that Graham "did not belong in jail" or "did not deserve" his charges are vague and do not directly contradict KV1's trial

16

testimony that Graham used force, threats, and fraud to sex traffic KV1. KV1 admitted during trial that she "did love" Graham in the past and she was "grateful" to him at the time. *Id.* at 72. So a vague statement that KV1 believed at one time that Graham did not "deserve" his charges would have added little to what was already in the record. And any impeachment value the statements had would have been undermined by KV1's testimony that both Graham and Moore pressured KV1 to change her story after Graham was arrested, Dkt. 215, Tr. Trans. Day 2, afternoon, at 111–12, supporting an inference that any previous hesitance by KV1 to testify against Graham was the result of that pressure, not any belief that Graham was innocent.

The bottom line is that testimony from Cornia about KV1's alleged statements would have done little to bolster Graham's defense, so it was not deficient performance for Cornia to refrain from offering that testimony, and the absence of Cornia's testimony was not prejudicial.

Graham contends that the court should apply the standard from conflict-of-interest cases, under which prejudice is shown if "there is a reasonable likelihood that . . . counsel's performance would have been different had there been no conflict of interest." *Blake v. U.S.*, 723 F.3d 870, 880 (7th Cir. 2013). But the conflict-of-interest standard applies only when "defense counsel was faced with a choice between advancing his own interests above those of his client." *Id.* That standard is not met in this case because, as already discussed, Cornia could have testified without compromising his own interests. And even if there was a conflict of interest, Graham has not alleged facts showing that Cornia would have tried to impeach KV1 with her prior statements if she had made those statements to someone else.

The court will dismiss this claim.

## D. Failure to seek KV1's mental health records

Before she pleaded guilty, Moore sought a subpoena for KV1's mental health records, and she asked the court to conduct an in camera review to determine which records should be disclosed. Dkt. 76. The government moved to quash the subpoena. Dkt. 130. Before the court issued a ruling, Moore entered a plea agreement with the government, so Magistrate Judge Crocker concluded that the issue was moot. Dkt. 157.

Graham contends that it was unreasonable for Cornia not to pursue the mental health records without knowing what information was in the records. Graham says that the records "could speak to KV1's competency to testify, inconsistent prior statements, or other matters related to her credibility." Dkt. 283, at 38. To support that belief, Graham cites a journal entry that KV1 wrote while she was receiving mental health treatment. The entry is styled as a letter to Graham, and it includes the following paragraph:

> I love you so much. Your the best African I met. You provide me with everything fast food "chicken nugget." An Iphone lets not forget dinner and a movie. You helped me get over Saad. Thank God he was nothing but spoiled milk. You are different you've been my [illegible] every since. I wish I met you first.

Dkt. 76, at 4. Graham says that more statements like this could be in KV1's mental health records.

This claim fails on both the deficient performance and the prejudice requirements of an ineffective assistance claim. As for deficient performance, Cornia explained during the final pretrial conference with Magistrate Judge Crocker why he did not seek the records:

> I think it's going to come up that there was some mental health issues. But as far as what those contain, it's never been my practice, unless I think it's extremely pertinent to the case, that those come in. And I think it's well enough—it would be well-enough established that she had bipolar disorder, that she was being medicated, that that— I think she can testify to that.

18

Dkt. 266, at 56:4–11. He continued that he "did a lot of Chapter 51 cases and 55 cases" and had "seen a lot of medical records," so he had "a pretty good gist of what we'd find, particularly in regards to a bipolar disorder." *Id.* at 57:3–6. In response, Judge Crocker agreed that Cornia had taken "a logical and correct approach to this," *id.* at 56:13, reasoning that "it's not even clear at this point that Ms. Moore or her attorneys would have been granted permission to look at those records for anything," *id.* at 56:24–57:1, and it was speculative that the mental health records would include information that was favorable to Graham, *id.* at 57:12–18.

Graham does not address Cornia's or Magistrate Judge Crocker's reasoning in his brief, and he does not respond to any of the arguments the government made in the criminal case against disclosing the records. For this reason alone, the court concludes that Graham has forfeited any claim based on a failure to seek the mental health records. Graham's position seems to be that failing to seek mental health records is per se unreasonable in any case in which the victim testifies because it is always possible that such records will include information that is favorable to the defendant. But if a motion seeking to compel the disclosure of the records would have been denied, a failure to file such a motion is not deficient performance.

As for prejudice, Graham offers nothing but speculation to support a conclusion that KV1's mental health records include information that could have led to a different result at trial. KV1 admitted during her testimony that she suffered from depression and bipolar disorder and that she received in-patient mental health treatment and was prescribed medication. Dkt. 208, Tr. Trans. Day 2, morning, at 91:5–9, Dkt. 215, Tr. Trans. Day 2, afternoon, at 71:3–25, 117:18–25. Graham does not explain why additional details about KV1's treatment would have been helpful. Instead, he says that the records could have included additional favorable statements like those in KV1's journal. Graham does not explain why that

is a reasonable inference, but even if it is, there is no reasonable possibility that such statements would have changed the result of the trial. KV1 discussed the journal at trial, and she admitted that she wrote that she "love[d]" Graham and was "grateful for him for being in [her] life." Dkt. 215, Tr. Trans. Day 2, afternoon, at 72:11–12. Those statements do not undermine KV1's testimony that Graham used force, threats, and fraud to sex traffic KV1. But even if the statements were favorable to Graham, they did not sway the jury, so it is unlikely that more statements of the same kind would have.

Graham cites *Brown v. Smith*, 551 F.3d 424 (6th Cir. 2008), as supporting a finding of ineffective assistance of counsel under the circumstances of this case. But that case is distinguishable. The petitioner had been convicted of sexually assaulting his fourteen-year-old daughter. Before trial, the daughter's therapist contacted defense counsel offering to testify for the defendant and later sent two letters to the court "express[ing] her belief that an innocent man had been convicted." *Id.* at 431. Despite this, defense counsel neither sought the daughter's therapy records nor followed up with therapist.  In this case, Graham has identified no basis to believe that KV1's mental health records included noncumulative evidence that was favorable to Graham.  Speculation is not enough to support an ineffective assistance of counsel claim for failing to seek mental health records. *See Thompson v. Hepp,* No. 17-cv-805-wmc, 2021 WL 861135, at *7 (W.D. Wis. Mar. 8, 2021); *Amey v. Patton*, 606 F. App'x 924, 929 (10th Cir. 2015).

CONCLUSION

The court will hold a hearing on Graham's claim that his trial counsel provided ineffective assistance in advising Graham whether to accept the government's plea offer. All other claims are dismissed.

ORDER

IT IS ORDERED that:

1. Erin Graham's motion to hold a hearing on his claims under 28 U.S.C. § 2255 is GRANTED in part and DENIED in part. The court will hold a hearing on Graham's claims that his trial counsel provided ineffective assistance of counsel by failing to investigate the potential testimony of witnesses, failing to discuss the government's fraud theory, failing to explain the sentencing implications of all the charges, and failing to provide timely notice of the government's plea offer. Graham's claims that trial counsel provided ineffective assistance by failing to withdraw from the case and failing to seek KV1's mental health records are DISMISSED.

2. The clerk of court is directed to contact the parties to set a half-day hearing in May 2026.

3. No later than 28 days before the hearing, the parties are to subpoena any witnesses who are not testifying voluntarily and to seek writs of habeas corpus ad testificandum for any incarcerated witnesses.

4. No later than 21 days before the hearing, the parties are to file any pre-hearing motions, witness lists, and exhibit lists, along with electronic copies of those exhibits. The clerk of court will send counsel instructions on how to submit exhibits to the court. Objections and responses are due no later than 14 days before the hearing.

5. If needed, the court will hold a pre-hearing conference one week before the hearing.

Entered January 8, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

21